# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| HALL & ASSOCIATES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-1055 (KBJ) |
| | ) | |
| U.S. ENVIRONMENTAL | ) | |
| PROTECTION  AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

"The selective refusal of administrative agencies to conduct their internal
proceedings consistently with adverse rulings of the courts of appeals—a practice
commonly termed agency nonacquiescence—is not new in American law."  Samuel
Estreicher & Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*,
98 Yale L.J. 679, 681 (1989).  As far as this Court can tell, agencies often publicly
announce their decisions to limit the reach of an adverse circuit court ruling, *see, e.g.*,
*Nat'l Envtl. Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999, 1003 (D.C. Cir. 2014),
which means that, for the purpose of the Freedom of Information Act ("the FOIA"),
records that reflect the agency's internal deliberations prior to its nonacquiescence
announcement are fairly deemed both predecisional and deliberative, *see* 5 U.S.C.
§ 552(b)(5).  Here, the Environmental Protection Agency ("the EPA") maintains that it
has not yet made a nonacquiescence decision with respect to a certain circuit court
ruling that was handed down five years ago—a representation that Plaintiff Hall

& Associates LLC ("H&A"), an environmental consulting firm, vigorously disputes. Thus, in order to evaluate the propriety of the EPA's invocation of the deliberative-process privilege with respect to H&A's request for records concerning the EPA's purported nonacquiescence, this Court must decide whether the agency has, in fact, made a nonacquiescence decision, and if so, *when*?

These and other privilege issues arise in the context of the instant FOIA lawsuit, which H&A filed against the EPA in July of 2015. (*See* Compl., ECF No. 1.) Notably, at that point, H&A had been on a crusade against the EPA's regulation of a water treatment practice known as "blending" for at least 6 years. *See Ctr. for Regulatory Reasonableness v. EPA*, 849 F.3d 453, 454 (D.C. Cir. 2017). The details of the EPA's policies with respect to blending are not pertinent to the instant case; it suffices to say that, in 2013, in a case called *Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013), the Eighth Circuit vacated an EPA rule pertaining to that practice at H&A's behest, on the grounds that the agency had effectively propagated a legislative rule regarding blending practices without engaging in the required notice and comment procedures, *id*. at 872–76. H&A believes that the EPA has decided not to apply the Eighth Circuit's decision on a nationwide basis, and the instant action pertains to one of H&A's many attempts to locate internal agency documents that reflect the EPA's decision-making in this regard.

As relevant here, in the wake of *Iowa League of Cities*, H&A submitted a records request to the EPA under the FOIA, asking for documents relating to the agency's approach to blending *outside* of the Eighth Circuit. (*See* Compl. ¶¶ 2–3.) According to H&A, the EPA withheld responsive documents and information on the grounds that the

attorney-client and deliberative-process privileges shield these documents from disclosure pursuant to FOIA Exemption 5. (*See id.* ¶ 5.) And now, in the instant lawsuit, H&A accuses the EPA of improperly withholding those records because it contends that the agency *has* decided not to apply the Eighth Circuit's ruling nationally, and the requested records reflect as much, thereby revealing the "working law" of the agency. (*See id.* ¶¶ 38–40; *see also id.* ¶ 37 (asserting that "[the] EPA has clearly rendered a final decision regarding the national applicability of the *ILOC* decision" and that "H&A's Request [merely] sought the decision documents themselves, and the bases of this decision" because "[t]he regulated community has a right to know the Agency's working law").)

Before this Court at present are the parties' cross-motions for summary judgment along with several other procedural motions that H&A has filed. (*See* Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 43; Pl.'s Mem. in Supp. of Its Cross-Mot. for Summ J., Mot. for Leave to Amend Its Compl., Resp. in Opp'n to Def.'s Mot. for Summ. J., Mot. to Conduct Limited Disc. & Strike the Nagle Decl. ("Pl.'s Mem."), ECF No. 44-1.) In its summary judgment motion, the EPA maintains that, because no nonacquiescence decision has been made to date, the deliberative-process and attorney-client privileges permit the agency to withhold the predecisional deliberations and confidential attorney-client communications contained within the documents H&A requests. (*See* Def.'s Mem. at 17–23.)[1] H&A responds that the EPA made its decision about how it would respond to *Iowa League of Cities* back in August of 2013, and thus the agency has wrongfully invoked the deliberative-process and

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

attorney-client privileges to shield records that actually constitute the working law of the agency. (*See* Pl.'s Mem. at 20–38.)

On March 31, 2018, this Court issued an Order that **GRANTED IN PART** and **DENIED IN PART** both parties' cross-motions for summary judgment, and that also **DENIED** (as moot or otherwise) H&A's requests to amend its complaint, conduct discovery/strike a declaration that the agency had submitted, and accelerate the Court's consideration of this case. (*See* Order, ECF No. 68.) This Memorandum Opinion provides the Court's reasons for that Order. In short, after reviewing the parties' briefs, examining the record, and conducting an *in camera* review of the disputed documents in this case, this Court concludes that the EPA made a nonacquiescence decision with respect to the Eighth Circuit's *Iowa League of Cities* opinion as of November 19, 2013. Yet, because that decision post-dated the creation of the vast majority of the nine documents that remain in dispute in this case, and also because most of the redactions in these documents shield the authors' subjective opinions, this Court concludes that the EPA's withholdings are largely justified, with a few exceptions. In reaching this conclusion, the Court also rejects the argument that these documents constituted the working law of the agency, or were officially acknowledged by the EPA; again, with one minor exception. The Court has further concluded that the EPA has not acted in bad faith in this litigation or in its handling of H&A's FOIA request, and thus, H&A's motion to strike, motion for discovery, and request for sanctions have been denied.

## I.    BACKGROUND

### A. H&A's FOIA Request

On November 13, 2014, H&A filed a FOIA request with the EPA (*see* FOIA Request, Ex. A to Renewed Decl. of Deborah Nagle, ECF No. 43-2), seeking an array of

documents that had been prepared for, or were created by, two high level agency officials—Nancy Stoner, the EPA's former Acting Assistant Administrator for Water, and Mark Pollins, the Director of the EPA's Water Enforcement Division.  The documents that H&A requested pertained to two national Clean Water Act seminars that occurred in November of 2013 and April of 2014.  (*See id.* at 2–3.)  Specifically, H&A sought

> (1) [a]ny EPA records which discuss whether or not Ms. Stoner's November 2013 statement was accurately reported in the trade press;
>
> (2) [a]ny talking points and/or other materials prepared for Ms. Stoner and/or Mr. Pollins in advance of their presentations at either of the above-referenced events or used by them at the events;
>
> (3) [a]ny presentation materials EPA distributed as part of the aforementioned presentations;
>
> (4) [a]ny records that either Ms. Stoner or Mr. Pollins created as part of their respective presentations; and
>
> (5) [a]ny records that either Ms. Stoner or Mr. Pollins created in preparation for their respective presentations.

(*Id.* at 3.)

After speaking with the EPA about the scope of this request, H&A agreed to narrow its FOIA request to the records in the above categories that pertain to the "EPA's position on the national applicability of the Eighth Circuit decision in *Iowa League of Cities*[.]"  (Scope Emails, Ex. B. to Renewed Decl. of Deborah Nagle, ECF No. 43-3, at 3–4.)  Then, on January 22, 2015, the EPA issued its response, identifying ten documents that were responsive to H&A's request.  (*See* EPA Response, Ex. C to Renewed Decl. of Deborah Nagle, ECF No. 43-4, at 2–3.)  Based on the EPA's Vaughn Index (*see* Vaughn Index, Ex. K to Renewed Decl. of Deborah Nagle, ECF No. 43-12,

at 2–16), as well as this Court's review of the unredacted versions of these records, those ten documents are generally described as follows.

Document 1 is an email that was transmitted to a number of EPA officials on November 15, 2013, suggesting a meeting, with the subject line "Iowa League of Cities." Document 1(a), also dated November 15, 2013, is an early draft of talking points discussing the implications of the *Iowa League of Cities* decision and possible approaches that the EPA could take in light of that decision. Document 1(b) is a draft memorandum that further discusses how *Iowa League of Cities* could impact the EPA's regulations and its future decision-making activities. Document 2 is an email sent from Nancy Stoner to EPA staff members and attorneys on November 14, 2013, discussing the *Iowa League of Cities* decision, and Document 3 is an email from November 15, 2013 in response. Document 4 is an email exchange between assorted employees at EPA Headquarters, dated November 18, 2013, transmitting certain other documents— (Documents 4(a) and 4(b))—to supervisors at EPA Headquarters. Document 4(a) is a subsequent version of Document 1(a), while Document 4(b) consists of a draft document that discusses various regulatory approaches that the EPA can take in regulating water quality. Document 5 is a days-long email chain (spanning November 15 through 18) among various EPA employees and attorneys, regarding how the agency's eventual views on *Iowa League of Cities* should be communicated to the public. Finally, Document 6 is a series of emails, dated November 26, 2013, among staff members of the EPA's Office of Enforcement and Compliance Assurance within the Office of Water, that discusses comments that Nancy Stoner made at a seminar on November 20, 2013.

In the context of the instant lawsuit, the EPA has asserted that FOIA Exemption 5—and in particular, the attorney-client and deliberative-process privileges—apply to the contents of these ten documents, in whole or in part, and as a result, the agency has released one document in full,[2] withheld two documents in full, and produced seven others with partial redactions.  (Renewed Decl. of Deborah Nagle, ECF No. 43-1, ¶ 9.) In response, H&A launched an administrative appeal, where it met with partial success. (*See id.*; *see also* Appeal Letter, Ex. E to Renewed Decl. of Deborah Nagle, ECF No. 43-6, at 2–8; Appeal Determination, Ex. F to Renewed Decl. of Deborah Nagle, ECF No. 43-7, at 2–4.)  Even so, the EPA continued to withhold two documents in full and portions of seven other documents, relying upon the deliberative-process privilege to justify its withholdings in Documents 1(a), 1(b), 2, 3, 4, 4(a), 4(b), 5, and 6, and also the attorney-client privilege to support its withholdings in Documents 1(b), 2, 3, and 5. (*See* Renewed Decl. of Deborah Nagle ¶¶ 10–12; *see also* Appeal Determination at 2–3.)

### B.  Procedural History

H&A filed the instant lawsuit on July 6, 2015.  (*See* Compl.)  The parties have now filed cross-motions for summary judgment with respect to H&A's claim that the EPA has wrongfully withheld agency records in violation of the FOIA, and these motions ripened on October 21, 2016.  (*See* Def.'s Reply in Supp. of Its Mot. for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ J. ("Def.'s Reply"), ECF No. 54; Pl.'s Reply in Supp. of Its Cross-Mot. for Summ. J. & Mot. for Leave to Amend Its Compl. ("Pl.'s Reply"), ECF No. 57.)

---

[2] As a result of the administrative proceedings, Document 1 was released in full, and is not in dispute in this case.

In the main, as mentioned above, the parties' summary judgment briefs present granular arguments regarding whether or not the EPA correctly invoked Exemption 5's attorney-client and deliberative-process privileges to withhold information contained in nine documents. Significantly, the EPA insists that its withholdings are proper primarily because it has not yet made a decision as to whether or not it will apply the Eighth Circuit's decision in *Iowa League of Cities* on a nationwide basis (*see* Def.'s Mem. at 5; Def.'s Reply at 4, 20), which it says means that most of the withheld information is predecisional and deliberative, for the purposes of the deliberative-process privilege, and the agency further claims that some of the documents also enjoy the protection of the attorney-client privilege, because they contain confidential communications between EPA staff members and agency attorneys (*see* Def.'s Mem. at 17–23; Def.'s Reply at 7–20). For its part, H&A argues that the EPA has, in fact, made a nonacquiescence decision, and according to H&A, the agency did so in August of 2013, when the agency decided not to seek certiorari in the *Iowa League of Cities* case. (*See* Pl.'s Mem. at 27; Pl.'s Reply at 4–7.) Thus, H&A argues that the documents that the EPA has withheld in this case constitute the working law of the agency and cannot be withheld under either the deliberative-process or attorney-client privileges. (*See* Pl.'s Mem. at 23–29; Pl.'s Reply at 16–18.)

H&A has also filed a number of ancillary motions, one of which maintains that the EPA conducted an unreasonable search for records in response to H&A's request. (*See* Mot. to Am./Correct Compl., ECF No. 46.) Because H&A seeks to make this allegation now, for the first time in the history of this FOIA dispute, H&A's motion seeks permission to amend the complaint to add a search-related claim. (*See id.* at 1.)

This Court denied that motion in its Order of March 31, 2018; here the Court explains that the motion was denied because H&A's search claim was never raised with the agency and thus is manifestly unexhausted. *See DiBacco v. U.S. Army*, 795 F.3d 178, 184 (D.C. Cir. 2015) ("Exhaustion of th[e] administrative appeal process is a prerequisite to seeking judicial relief, unless the agency has not responded within the statutory time limits."); *DeBrew v. Atwood*, 792 F.3d 118, 123 (D.C. Cir. 2015) ("Requiring [the plaintiff] to follow up with the [agency] before filing suit is consistent with, indeed essential to, accomplishing the 'purposes of exhaustion[.]'"). The Court addresses H&A's other ancillary motions—which, in essence, seek to punish the EPA because H&A believes that the EPA has litigated this case in bad faith (*see* Pl.'s Mem. at 38–40; Pl.'s Reply at 19–20)—below. (*See* Part III.D, *infra* (analyzing H&A's joint motion to strike and motion for discovery (ECF No. 47), and addressing the implicit request for sanctions to be imposed against the EPA's attorneys).)

### C. The Record Before The Court

To substantiate their respective contentions about the EPA's alleged nonacquiescence decision, the parties have produced a plethora of affidavits and exhibits. The documents that have been submitted to the Court—which include unredacted copies of various records responsive to H&A's FOIA requests—demonstrate that, beginning in the summer of 2013, the staff at EPA headquarters actively discussed how the agency should respond to the *Iowa League of Cities* decision of March 25, 2013, both inside and outside of the Eighth Circuit. The discussion appears to have commenced in earnest in July, when the EPA considered whether or not to seek a writ of certiorari in the *Iowa League of Cities* case. (*See* EPA July 31, 2013, Email, Ex. 2 to Pl.'s Mem., ECF No. 44-3, at 12.) The parties here hotly contest when, if at all, the

'what-shall-we-do' period of discussion *ended*. As for the nature of the discussion, public documents reflect that EPA employees specifically debated, among other things, whether the agency should "formally or informally non-acquiesce" or should otherwise undertake to adopt "any formal position on the 8th Circuit's substantive conclusions[.]" (EPA's Oct. 29, 2013, "ILOC Next Steps" ("Next Steps Memo"), Ex. 8 to Pl.'s Mem., ECF No. 44-3, at 42; *see also* EPA's Oct. 29, 2013, "Moving Forward" Action Plan, Ex. 9 to Pl.'s Mem., ECF No. 44-3, at 45.)

Notably, in mid-November of 2013, EPA officials began to make a series of public statements regarding the agency's post-*Iowa League of Cities* approach to blending. These statements were issued in a variety of contexts: for example, at an EPA-led conference relating to the regulation of clean water practices that took place on November 13, 2013, a member of the EPA's Office of General Counsel stated that the *Iowa League of Cities* decision will "only be binding to the Eighth Circuit [s]tates[.]" (7th Annual 4-State Gov. Affairs Meeting Minutes, Ex. 11 to Pl.'s Mem., ECF No. 44-3, at 80.) Yet, EPA Headquarters staff members at that conference also indicated that it still "[did not] have everything figured out yet" with regard to its post-*Iowa League of Cities* approach. (*Id.*)

Next, on November 19, 2013, the EPA released a written "Desk Statement" (i.e., a press release) to Bloomberg News in anticipation of the agency's subsequent National Association of Clean Water Act ("NACWA") law seminar. That Desk Statement stated that

> [t]he Eighth Circuit's interpretation in [*Iowa League of Cities*] . . .
> is legally binding within the Eighth Circuit. Outside of the Eighth
> Circuit, EPA will continue to work with States and communities with
> the goal of finding solutions that protect public health and the

environment while recognizing economic constraints and feasibility
concerns, consistent with the Agency's existing interpretation of the
regulations.

(EPA Desk Statement, Ex. 16 to Pl.'s Mem., ECF No. 44-4, at 41.)  The following day,

while at the NACWA seminar, Nancy Stoner explained that the EPA intended to

implement the *Iowa League of Cities* decision inside the Eighth Circuit, but, "[o]utside

the Eighth Circuit," the EPA would examine situations "on a case-by-case [basis]" in

order "to see what makes sense[.]"  (Bloomberg BNA Article, Ex. 17 to Pl.'s Mem.,

ECF No. 44-4, at 43.)  Finally, on November 22, 2013, EPA Headquarters sent an email

forwarding the Bloomberg News Desk Statement to the EPA's regional offices (EPA

Headquarters Nov. 22, 2013, Email, Ex. 20 to Pl.'s Mem., ECF No. 44-4, at 54), along

with the remark that the contents of that statement applied "[f]or the interim, until we

are able to roll out a clear message" (Minutes from EPA's Nov. 21, 2013 Branch Chief

Call with Transmittal Email, Ex. 19 to Pl.'s Mem., ECF No. 44-4, at 51).

As explained, the parties' summary judgment motions require this Court to

decide whether the EPA has, in fact, made a decision to nonacquiesce with respect to

the Eighth Circuit's *Iowa League of Cities* opinion, and if so, when, as is necessary for

the Court to evaluate the agency's contention that records concerning the agency's

response are predecisional and deliberative, and are therefore subject to withholding

pursuant to the deliberative-process privilege, and also the attorney-client privilege

under FOIA Exemption 5.

## II.    LEGAL STANDARDS

### A. Summary Judgment In FOIA Cases

"FOIA cases typically and appropriately are decided [through] motion[s] for

summary judgment." *Judicial Watch, Inc. v. Dep't of the Navy*, 25 F. Supp. 3d 131, 136 (D.D.C. 2014) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). Summary judgment is appropriate when the pleadings, record, and any *in camera* documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And because the FOIA favors disclosure, the defending agency bears the burden of demonstrating in its motion for summary judgment that it has "fully discharged its obligations[.]" *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996). In deciding whether the agency has carried this burden, the district court will review the agency's evidence and arguments under a de novo standard of review, *see Stein v. DOJ*, 134 F. Supp. 3d 457, 468 (D.D.C. 2015), and it will interpret all of the facts "in the light most favorable to the FOIA requester[,]" *Willis v. DOJ*, 581 F. Supp. 2d 57, 65 (D.D.C. 2008).

As a general matter, courts evaluating FOIA claims must bear in mind that, when "Congress enacted [the] FOIA[,]" it sought "to give the public access to official information long shielded unnecessarily from public view." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017) (internal quotation marks and citation omitted). Because of that overarching objective, the FOIA "calls for broad disclosure of [g]overnment records[,]" and it allows federal agencies to withhold only those documents which fall under one of section 552(b)'s nine enumerated exemptions. *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). To prevent federal agencies from misusing the exemptions, courts "narrowly construe[]" each of these exemptions, *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011), and they place the burden of demonstrating an

exemption's applicability on the defending agency, *see DOJ v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).

## B. FOIA Exemption 5

As relevant here, FOIA Exemption 5 provides that an agency need not disclose "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Congress adopted this exemption because "the quality of administrative decision-making" would suffer if the FOIA "forced [agencies] to 'operate in a fishbowl[.]'" *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977) (emphasizing that an agency must engage in a "full and frank exchange of ideas" in order to determine the merits of a given policy). Thus, Exemption 5 shields memoranda and other agency-created documents that would be protected from civil discovery by a "recognized evidentiary or discovery privilege[.]" *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 874 (D.C. Cir. 2010). Accordingly, that exemption encompasses both of the privileges at issue in this case: "the deliberative-process privilege [and] the attorney-client privilege[.]" *Nat'l Ass'n of Criminal Def. Lawyers v. U.S. Dep't of Justice, Exec. Office for U.S. Attorneys*, 844 F.3d 246, 249 (D.C. Cir. 2016).

The deliberative-process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Abtew v. DHS*, 808 F.3d 895, 898 (D.C. Cir. 2015) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001)). Therefore, the deliberative-process privilege covers "documents reflecting advisory opinions, recommendations[,] and deliberations" that "compris[e] part of a process by which governmental decisions and policies are formulated[.]" *Klamath*

13

*Water*, 532 U.S. at 8 (internal quotation marks and citation omitted). Stated more concretely, the deliberative-process privilege exempts an agency document from disclosure under the FOIA if the information it contains is both "predecisional" and "deliberative." *Judicial Watch, Inc.*, 847 F.3d at 739. The agency bears the burden of demonstrating that the information in a given document meets both of these criteria, and the Court must evaluate each document individually, "because the [application of the] deliberative process privilege is . . . dependent upon the individual document and the role it plays in the administrative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). And a document that contains *both* privileged *and* non-privileged information must be redacted and the non-privileged information must be produced, so long as the non-privileged information is reasonably segregable. *See Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 58 (D.C. Cir. 2003).

The attorney-client privilege also involves the protection of information generated during the decision-making process, but its aim is different than the deliberative-process withholdings: the attorney-client privilege seeks "to assure that a client's confidences to his or her attorney will be protected, and therefore encourage[s] clients to be as open and honest as possible with attorneys." *Coastal States*, 617 F.2d at 862; *see also United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (noting that the privilege exists "to encourage full and frank communication between attorneys and their clients" (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981))). Because FOIA cases always involve government defendants, courts treat the agency as the 'client' and the agency's lawyer as the 'attorney' for purposes of the

attorney-client privilege. *See Tax Analysts v. IRS* ("*Tax Analysts I*"), 117 F.3d 607, 618 (D.C. Cir. 1997). Furthermore, this privilege "extends to those communications between attorneys and *all* agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication." *Mead Data*, 566 F.2d at 253 n.24 (emphasis added). Given the size of most federal agencies, the scope of this privilege might sound expansive; but in practice, it is not, because it is well established that the attorney-client privilege protects only (1) those "confidential communications from client to attorney, and from attorney to client[,]" that (2) relate to the giving of legal advice. *Pub. Emps. for Envtl. Responsibility v. EPA*, 211 F. Supp. 3d 227, 230–31 (D.D.C. 2016) (citing *Coastal States*, 617 F.2d at 862) (other citations omitted).

### C. Limitations On Exemption 5

"[E]ven if the documents at issue . . . fall under the scope of Exemption 5, there are circumstances under which they will be found outside the scope of that [exemption's] protection." *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 194–95 (2d Cir. 2012). Indeed, the Supreme Court and the D.C. Circuit have together established that Exemption 5's protection from disclosure does not apply in certain circumstances. For example, if the document in question constitutes the agency's "working law"—i.e., if it reflects an agency "opinion[] [or] interpretation[] which embod[ies] the agency's effective law and policy[,]"—then it cannot be withheld under Exemption 5. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152–53 (1975). Second, and similarly, if an agency has subsequently adopted an otherwise-privileged internal document as the rationale for an agency determination or position, then that document, too, cannot be shielded from disclosure. *See Coastal States*, 617 F.2d at 866; *see also* Note, *The*

*Freedom of Information Act and the Exemption for Intra-Agency Memoranda*, 86 Harv.

L. Rev. 1047, 1057–58 (1973) (explaining that Exemption 5 does not protect documents

that contain "statements of policy or interpretations of law actually adopted by an

agency and documents containing the basis and rationale for its disposition of particular

cases"). Moreover, and finally, an agency cannot withhold the contents of a document

if the agency has waived its right to invoke the applicable privileges by "officially

acknowledg[ing]" the contents of the document in question. *Cottone v. Reno*, 193 F.3d

550, 554 (D.C. Cir. 1999).[3] The case at hand directly implicates both of these

doctrines.

## III. ANALYSIS

In their summary judgment motions, the parties dispute whether the EPA can

withhold information contained in nine documents under Exemption 5's deliberative-

process or attorney-client privileges. Broadly speaking, this debate revolves around

whether the EPA has ever made a decision to nonacquiesce with respect to the Eighth

Circuit's decision in *Iowa League of Cities*, and if the EPA did so, *when* the agency can

be said to have made that decision. (*See* Pl.'s Mem. at 24–25 (calling this the "linchpin

issue" in the case).)

Given the mix of information and contentions that are presented in this case, this

Court's evaluation has proceeded as follows. The Court has, first, evaluated whether or

not the EPA can withhold the contested records under Exemption 5's deliberative-

process privilege; then, for any documents that are not protected by the deliberative-

---

[3] The "official acknowledgment" doctrine appears to be synonymous with the "public domain exception" or the "prior disclosure" doctrine. *See ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013); *Wolf v. CIA*, 473 F.3d 370, 378–79 (D.C. Cir. 2007).

process privilege but that the EPA maintains are subject to the attorney-client privilege, the Court has proceeded to determine whether the attorney-client privilege applies. After thereby identifying the universe of documents that fall within Exemption 5's ambit, the Court has further assessed whether the EPA must nonetheless disclose the privileged documents and information, either because they constitute the working law of the agency or because the EPA has officially acknowledged the contents of these records.

As explained fully below, this multi-step analytical journey has led the Court to conclude as follows: the EPA must disclose Documents 4 and 6 in their entirety as well as isolated statements contained in Documents 1(a) and 1(b), but the agency may continue to withhold all of the redacted material in Documents 2, 3, 4(a), 4(b), and 5 and most of the redacted material within Documents 1(a) and 1(b). This Court has also analyzed H&A's remaining procedural motions, and has declined to exercise its discretion to order that H&A be provided with discovery, that the Renewed Nagle Declaration be stricken, or that sanctions be imposed on the EPA's attorneys.

## A. The Deliberative-Process Privilege Applies To Some Of The Requested Records But Not All Of Them

As explained above, for a document to be protected by the deliberative-process privilege, the document "must be both pre-decisional and deliberative." *Abtew*, 808 F.3d at 898 (citation omitted). In practice, these two requirements "tend to merge," *Access Reports v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991), because the "term 'deliberative' does not add a great deal of substance to the term 'pre-decisional[,]'" *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014). The two concepts convey distinct requirements, however, because the "'predecisional' label clearly

focuses attention on the role of the entire document in the decisionmaking practice [while] the 'deliberative' criterion may be useful in distinguishing between privileged and non-privileged material within a single 'predecisional' document." *Access Reports*, 926 F.2d at 1195. Put another way, the predecisional analysis examines *when* the agency created a given record in relation to the timing of the decision to which the record relates, whereas the deliberative analysis indicates *whether* the statements in a given document reflect the give-and-take that occurs during an agency's consideration of which course of action it should pursue.

    1.    <u>The EPA Made The Nonaquiescence Decision At Issue Here On November 19, 2013; Therefore, The Eight Responsive Records That Were Created Before That Date Are Predecisional</u>

"A document is predecisional if it precedes, in temporal sequence, the decision to which it relates." *Abtew*, 808 F.3d at 898 (quoting *Senate of the Commonwealth of Puerto Rico v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987)) (internal quotation marks omitted); *see also Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (explaining that a predecisional document is a record that is "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made" (citation omitted)). To evaluate the predecisional nature of a record, it is crucial that a court "first be able to pinpoint an agency decision or policy to which these documents contributed[,]" for only then can the court assess the temporal relationship between that document and the agency's decision. *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983) (internal quotation marks omitted)).

Thus, here, the first step in deciding whether the deliberative-process privilege applies to the records that the EPA has withheld is to "pinpoint" when, if ever, the EPA

made a nonacquiescence determination with respect to the Eighth Circuit's *Iowa League of Cities* opinion. As explained, "nonacquiescence" is generally considered to be "[t]he selective refusal of administrative agencies to conduct their internal proceedings consistently with adverse rulings of the courts of appeals." Estreicher & Revesz, 98 Yale L.J. at 681; *see also id.* at 687 (noting that "intercircuit nonacquiescence"—the type at issue in the instant case—occurs when an agency "refuses to follow, in its administrative proceedings, the case law of a court of appeals other than the one that will review the agency's decision"). Scholars and courts of appeals have spilled much ink defining what it *means* for an agency to nonacquiesce and/or whether an agency can do so consistent with the Constitution, but few have expounded upon how a court ought to determine if, or when, an agency has adopted a policy of nonacquiescence.

The most helpful case in this regard hails from the Southern District of New York; it explains that, "[t]o establish agency non-acquiescence, the evidence must demonstrate that the agency has deliberately failed to follow the law of the circuit" that has ruled against the agency. *Stieberger v. Sullivan*, 738 F. Supp. 716, 728 (S.D.N.Y. 1990) (quoting *Hyatt v. Heckler*, 807 F.2d 376, 379 (4th Cir. 1986)) (internal quotation marks omitted). That case further indicates that there are two ways in which evidence can demonstrate such nonacquiescence. First, the record can show that an agency has "formally announce[d] that it will non-acquiesce [to] a particular decision." *Id.*; *see, e.g.*, *Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d 16, 20–21 (D.C. Cir. 2016) (identifying a nonacquiescence policy based on statements by the NLRB that amounted to a policy of nonacquiescence); *Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1003 (same). Or, in the event that an agency remains completely silent on its precise

course of action, evidence of "substantial differences between agency policy and court of appeals holdings" that "have influenced the agency's adjudication of individual cases" in a deliberate, pervasive, and ongoing manner will suffice. *Stieberger*, 738 F. Supp. at 728–29; *see also* Estreicher & Revesz, at 688–89 (noting that the actions of agency adjudicators can evidence agency nonacquiescence).[4]

Applying those legal standards to the present facts, this Court concludes that the EPA has made a nonacquiescence decision with respect to the Eighth Circuit's March 2013 *Iowa League of Cities* decision, and that the agency reached this conclusion as of November 19, 2013. On that date, the EPA issued a Desk Statement, which explained that, although the *Iowa League of Cities* opinion was "legally binding within the Eighth Circuit[,] [o]utside of the Eighth Circuit, [the] EPA will continue to work with States and communities with the goal of finding solutions that protect public health and the environment" in a manner that is "*consistent with the Agency's existing interpretation of the regulations.*" (Desk Statement at 41 (emphasis added).) This language clearly indicated that the EPA was *not* committing to applying the Eighth Circuit's holding nationwide. Instead, outside of the Eighth Circuit, the EPA intended to follow its existing interpretation of its regulations, which the the Eighth Circuit had struck down in *Iowa League of Cities*. What is more, the EPA effectively authorized Bloomberg News to release the statement to the public at large, and thus represent to the relevant regulated parties that the agency intended to nonacquiesce outside of the Eighth Circuit.

---

[4] *Stieberger* dealt with *intracircuit* nonacquiescence, which is when an agency purposefully disobeys the court of appeals that issued the unfavorable opinion within the affected jurisdiction, and not the alleged intercircuit nonacquiescence at issue here. However, in this Court's view, the opinion still provides guidance about how to evaluate whether or not an agency has made a decision to nonacquiesce. *See* 738 F. Supp. at 728.

(*See* Transmittal Emails of EPA Decision Documents, Ex. 30 to Pl.'s Mot., ECF No. 44-4, at 103.) *See also Ctr. for Regulatory Reasonableness*, 849 F.3d at 454 (D.C. Cir. 2017) (noting that "[b]eginning in 2013, EPA made statements indicating that it would not acquiesce in or follow the Eighth Circuit's decision outside of that circuit"); *see also Stieberger*, 738 F. Supp. at 728 (indicating that agencies can, and do, "formally announce" their nonacquiescence).

A plethora of evidence supports the conclusion that the agency's Desk Statement amounted to a formal announcement of nonacquiescence, notwithstanding the EPA's current protestations. First of all, as noted, the statement differentiating between agency policy inside and outside the Eighth Circuit was publicly released. It also appears that the announced policy had the full approval of Nancy Stoner, who was the EPA's Acting Assistant Administrator for Water, as well as Cynthia Giles, the former Assistant Administrator for the Office of Enforcement and Compliance Assurance. (*See* Transmittal Emails at 103.) Both of these high-level EPA officials signed off on the release of the Desk Statement by the agency's Office of Media Relations, after a number of agency attorneys and staffers working on matters relating to the EPA's post-*Iowa League of Cities* approach proposed the language contained therein. (*See id.* at 103–108.) And during the NACWA conference, which took place the day after the statement was issued, Stoner orally confirmed that the agency will apply the *Iowa League of Cities* ruling on a case-by-case basis outside of the Eighth Circuit. (*See* Bloomberg BNA Article at 43.) All things considered then, as of November 19 and November 20, 2013, it was reasonably clear to all concerned that the EPA did not intend to apply the *Iowa League of Cities* decision across the board. *Cf. Nat'l Envtl.*

*Dev. Ass'n's Clean Air Project*, 752 F.3d at 1010–11 (concluding that a formal announcement of a case-by-case approach constituted a nonacquiescence decision).

The EPA does not present any non-conclusory evidence to the contrary. The agency has provided a declaration from Deborah Nagle that states that the "EPA has not, to date, decided whether and to what extent to follow *Iowa League* outside the Eighth Circuit" (Suppl. Nagle Decl., ECF No. 54-1, ¶ 5 (internal quotation marks and alterations omitted)), but this bald contention does not follow from the record facts and the plain language of the announcement that the agency made publically regarding its position, which indicate the opposite. The EPA is also mistaken to suggest that an expressed intention to proceed on a "case-by-case basis" does not amount to nonacquiescence. (Def.'s Mem. at 28.) To be sure, the agency has left itself room to choose to adopt the Eighth Circuit's ruling in individual cases in the future, in the context of its expressed intention to consider "solutions that protect public health and the environment" for communities outside the Eighth Circuit. (Desk Statement at 41.) But *Iowa League of Cities* requires the EPA to abandon the improperly prescribed rule that the agency now says it may choose to apply nonetheless outside of the Eighth Circuit in appropriate cases. *See* 711 F.3d at 878. So the EPA's reservation of the right to proceed "consistent with the Agency's existing interpretation" outside of the Eighth Circuit on a case-by-case basis (Desk Statement at 41), necessarily means that the agency has refused to commit to applying *Iowa League of Cities* as its policy in all jurisdictions, which is all that intercircuit nonacquiescence requires. *See* Estreicher & Revesz, 98 Yale L.J. at 687; *see also Taxation With Representation Fund*, *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 672 n.10 (D.C. Cir. 1981) (quoting an

agency official stating that nonacquiescence "means that we are not relying, or not following that opinion, that there is something in the opinion we disagree with" (internal quotation marks omitted)).

H&A appears to agree that the EPA chose to nonacquiescence, but it disagrees with the Court's conclusion that the agency made its nonacquiescence decision in mid-November of 2013. Instead, H&A maintains that the EPA actually demonstrated nonacquiescence when it decided not to seek *certiorari* on August 20, 2013. (*See* Pl.'s Mem. at 27.) But it is well established in this jurisdiction that a *certiorari* decision and a nonacquiescence determination are not one and the same. Indeed, the D.C. Circuit has made clear that an agency's decision to seek certiorari stands completely apart from a nonacquiescence determination. *See, e.g.*, *Taxation With Representation Fund*, 646 F.2d at 673 (explaining that the decision to seek a writ of certiorari and the decision to nonacquiesce are determined separately). (*See also* EPA Options Memo, Ex. 3 to Pl.'s Mot., ECF No. 44-3, at 15 (indicating that the EPA knew it had the option to acquiesce or nonacquiesce, even if it did not seek certiorari).)

H&A's contention that, "in late October [2013], [the] EPA determined specifically how it would nonacquiesce" (Pl.'s Mem. at 27), is similarly off base. The EPA did not make an announcement that it intended to nonacquiesce at that time, as it did in mid-November, and the evidence H&A points to does not actually indicate that the EPA engaged in a silent effort to implement a nonacquiescence policy with respect to its permitting decisions as of late October. Rather, the record demonstrates that the EPA was still debating whether or not it should nonacquiesce to the Eighth Circuit's decision in late October. (*See, e.g.*, Next Steps Memo at 42 (noting several options

available to the EPA, including "not tak[ing] any formal position on the 8th Circuit's substantive conclusions").)

The statement that an EPA official made at the Region VII Meeting, on November 13, 2013, also falls short of the nonacquiescence target. To be sure, on that day, one of EPA Headquarters' attorneys stated publicly that the Eighth Circuit's decision "will only be binding to the Eighth Circuit [s]tates." (Region VII Meeting Minutes at 80.) But that statement can reasonably be interpreted as the mere recitation of a known fact: a decision of the Eighth Circuit Court of Appeals does not "bind" the EPA outside of the Eighth Circuit. The relevant question is whether or not the agency intended to apply the *Iowa League of Cities* decision *outside* of the Eight Circuit, and, based on the record, the attorney does not appear to have made a clear proclamation on *that* point during the Region VII meeting. (*See id.*; *see also* Bergman Decl. in Supp. of Pl.'s Br., Ex. 13 to Pl.'s Mem., ECF No. 44-4, at ¶¶ 4–5.) To the contrary, the representation that the EPA "[did not] have everything figured out yet" was made, and, at most, the meeting involved "speculation by non-regulatory attendees that the ruling could [] have national implications[.]" (Region VII Meeting Minutes at 80.)

Therefore, in this Court's view, the record in this case simply does not establish that the EPA made a formal announcement regarding the agency's intentions to acquiesce or nonacquiesce before the issuance of its Desk Statement on November 19, 2013, much less that it deliberately and pervasively disregarded the *Iowa League of Cities* decision in its permitting decisions outside the Eighth Circuit. *Cf. Stieberger*, 738 F. Supp. at 728–29 (explaining that these are the two ways in which a Plaintiff can establish an agency has made a nonacquiescence decision). And having pinpointed the

date of the decision at issue—November 19, 2013—the Court finds that its task of determining which of the disputed documents "precede[d] in temporal sequence, the decision to which [they] relate[,]" *Abtew*, 808 F.3d at 895 (internal quotation marks and citation omitted), becomes relatively easy. Most of the disputed documents are dated emails or memoranda, and it is obvious that Documents 1(a), 1(b), 2, 3, 4, 4(a), 4(b), and 5 were created before the EPA's nonacquiescence decision of November 19, 2013. Furthermore, based on the Court's *in camera* review of the disputed records and the EPA's Vaughn Index, each of these documents qualifies as predecisional insofar as each was "part of a clear process leading to a final decision" by the EPA regarding whether it would nonacquiesce to the Eighth Circuit's decision. *Coastal States*, 617 F.2d at 868 (internal quotation marks omitted); *see also Pub. Emps. for Envtl. Responsibility v. EPA*, 213 F. Supp. 3d 1, 9 (D.D.C. 2016) (indicating that *Vaughn* indices "are presumed to be submitted in good faith"). By contrast, Document 6, which came into existence after November 19, 2019, cannot be predecisional because it does not precede the decision to which it relates. *See Abtew*, 808 F.3d at 898. Therefore, the deliberative-process privilege cannot apply to Document 6, and given that the EPA has not claimed any other privilege or exemption with respect to this document, that responsive record must be released in full.

2.  Most Of The Predecisional Documents And Statements In This Case
    Are Also Deliberative

To determine whether the contents of a given predecisional document are also deliberative, as FOIA Exemption 5 requires, a court must assess whether the withheld information is "'a part of the agency give-and-take . . . by which the decision itself is made.'" *Id.* at 899. Deliberative statements in documents typically encompass the

writer's "subjective, personal thoughts on a subject," *Petroleum Info. Corp.*, 976 F.2d at 1438 (quoting *Coastal States*, 617 F.2d at 869), and such statements are privileged because they serve "to facilitate or assist development of the agency's final position on the relevant issue[,]" *Nat'l Sec. Archive*, 752 F.3d at 463.  By contrast, "purely factual material" is not deliberative, and thus should not be withheld on the basis of the deliberative-process privilege unless it is so "'inextricably intertwined' with the policy-making process" that disclosing the factual information would reveal the agency's deliberations or deliberative process.  *Ryan v. DOJ*, 617 F.2d 781, 790 (D.C. Cir. 1980); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (acknowledging that "the legitimacy of withholding" factual material turns on "whether the selection or organization of facts is part of an agency's deliberative process").  Consequently, when identifying statements that are deliberative and therefore privileged, or when determining whether purely factual information should nevertheless be withheld, the "key question" becomes "whether disclosure of the information" reveals the agency's predecisional thought processes such that release "would discourage candid discussion within the agency."  *Access Reports*, 926 F.2d at 1195 (internal quotation marks and citations omitted).

By and large, this Court agrees with the EPA that the redactions the agency has made in Documents 1(a), 1(b), 2, 3, 4(a), 4(b), and 5—which are predecisional records, as determined above—represent the withholding of deliberative statements.  Documents 1(a), 1(b), 4(a), and 4(b) are all working drafts of memoranda and talking points, as the EPA's Vaughn Index indicates (*see* Vaughn Index at 2, 4, 9, 11), and this Court sees nothing in the record to suggest that the agency's representations about this fact were

not made in good faith, *see SafeCard Servs., Inc.*, 926 F.2d at 1200 (noting the presumption of good faith attributed to agency affidavits and Vaughn Indexes). In addition, these documents contain a number of comments, editing marks, and incomplete lists that support the agency's claim that these documents are drafts. (*See* Unredacted Documents 1(a), 1(b), 4(b).)

The draft status is a significant feature of these records, because the D.C. Circuit has specifically held that the deliberative-process privilege covers, *inter alia*, "draft documents" that "reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866; *see also Petroleum Info. Corp.*, 976 F.2d at 1435–36 (pointing out that a draft document, once released, would provide insight into the agency's deliberative process, because the FOIA requester could compare that draft with the agency's final document and draw conclusions from the differences between the two).[5] The fact that these drafts were transmitted from Kevin Weiss, one of the EPA's staff engineers, to various high-level policymaking officials at the EPA (*see* Vaughn Index at 2, 4, 9, 11; *see also* Unredacted Documents 1(b) & 4), is another sign that the documents "are likely to be more 'deliberative' in character[,]" *Schlefer*, 702 F.2d at 238 (citing *Sears*, 421 U.S. at 155).

Based on the fact that these documents are drafts that flowed from a subordinate to various supervisors in the EPA, and given what this Court observed in its *in camera* review of these records, the Court agrees with the EPA that most of the redactions in Documents 1(a), 1(b), 4(a), and 4(b) reflect the give-and-take exploration of options

---

[5] *But see also Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982) (warning that the deliberative-process privilege covers only those drafts that actually reflect the give-and-take of the agency process).

that characterizes the deliberative process. *See Abtew*, 808 F.3d at 899. However, the Court also notes that Documents 1(a) and 1(b) each contain a few factual statements that can be disclosed without revealing the EPA's deliberative process. *See Ancient Coin*, 641 F.3d at 513; *Ryan*, 617 F.2d at 790; *see also* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]"). The disclosable factual statements are:

- On page 1 of Document 1(a), the first three sub-bullet points under the third bullet point under the heading "Outside of Eighth Circuit[.]"

- On page 2 of Document 1(a), the redacted statements located under the subheading "What we said in Region 7."

- On page 1 of Document 1(b) the first complete paragraph immediately before the subheading "**1. Background.**"

The analysis differs somewhat for Documents 2, 3, and 5, but the result is much the same. As the EPA correctly notes in its Vaughn Index, two high-level EPA employees composed the emails that make up Documents 2, 3, and 5. (*See* Vaughn Index at 6, 12.) But that fact alone does not render these documents non-deliberative. *See Judicial Watch, Inc. v. DOJ*, 20 F. Supp. 3d 260, 271 (D.D.C. 2014) ("Even if the relationship between the author and recipient . . . is not one of subordinate and superior officials, when the role of the author is as an advice-giver rather than a decision-maker, this militates in favor of the document qualifying as part of the deliberative process."). In Documents 2 and 3, Stoner and a member of the Office of General Counsel provide advice regarding how staff members at EPA headquarters can focus their discussions with respect to the EPA's post-*Iowa League of Cities* response. (*See* Unredacted Documents 2, 3; *see also* Vaughn Index at 6–7.) Meanwhile, the redacted portions of

Document 5 mostly discuss how the agency ought to proceed in "determining the Agency's public messages on [] issues" relating to the *Iowa League of Cities* decision. (Vaughn Index at 13 (describing the redacted contents of Document 5).)  In other words, all three documents entail "proposals" or "suggestions" as to how the EPA should proceed with respect to discussions and communications about the *Iowa League of Cities* decision, *Coastal States*, 617 F.2d at 866, and it is well settled that the deliberative-process privilege protects such "advisory material[s,]" because they "contain[] opinions and recommendations" as to how the agency should handle various matters, *Mead Data*, 566 F.2d at 256.

The only document left to be discussed is Document 4, and upon review of an unredacted version of that record, this Court concludes that the deliberative-process privilege does not apply to any part of that document.  The lone redacted statement in that document does not reflect a subjective or personal opinion that contributed to the government's deliberations.  (*See* Unredacted Document 4.)  Indeed, as far as the Court can tell, the redaction concerns merely factual and historical information, and thus, the EPA is not entitled to withhold that same information in this context.  *See Ryan*, 617 F.2d at 790.  Nor does the Court believe that this information is so intertwined with the agency's deliberative process that the release of this information "would discourage candid discussion within the agency."  *Access Reports*, 926 F.2d at 1195 (internal quotation marks and citation omitted).  Therefore, the redaction in Document 4 is not subject to withholding pursuant to the deliberative-process privilege, and because the EPA does not contend that the redacted information is privileged or exempted on any other ground, the EPA must disclose Document 4 in its entirety.

## B. The Attorney-Client Privilege Does Not Apply To Any Portion Of Document 1(b)

At this point in the analysis, this Court has determined that Documents 4 and 6 and small portions of Documents 1(a) and 1(b) are not protected by the deliberative-process privilege. With respect to these withholdings, the EPA has provided an alternative argument for privilege only as to Document 1(b); therefore, the Court now turns to an analysis of whether the attorney-client privilege shields any portion of Document 1(b) from discovery, as the EPA maintains. (*See* Def.'s Mem. at 10.)

For the attorney-client privilege to apply, an agency must demonstrate that the document or statement that the FOIA requester seeks satisfies three criteria. *See Taylor Energy Co. v. U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt.*, 271 F. Supp. 3d 73, 91 (D.D.C. 2017). First, the information that the agency seeks to withhold must have been "communicated to or by an attorney as part of a professional relationship[,]" *Mead Data*, 566 F.2d at 253, which means that the attorney "act[ed] like a lawyer" and the communication between the lawyer and the client involved securing an "opinion on law[,] legal services[,] or [] assistance in some legal proceeding[,]" *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (per curiam) (citation omitted). Second, the information in the document must also be "confidential[,]" and lastly, it must be "based on confidential information provided by the client[,]" not by third parties. *Mead Data*, 566 F.2d at 253–54.

Because this Court has already concluded that the deliberative-process privilege shields most of the information in Document 1(b) for which the EPA has invoked the attorney-client privilege, the Court need only evaluate the information *not* covered by the deliberative-process privilege—i.e., the redacted paragraph immediately above the

heading "**1. Background**" in Document 1(b). (*See* Part III.A.2, *supra*.) With regard to that redaction, this Court concludes that the attorney-client privilege does not apply for at least two reasons. First of all, although the draft memo that is Document 1(b) was transmitted to at least one attorney at the EPA (along with other staff members) for his review and opinion (*see* Vaughn Index at 2, 4–5; Unredacted Document 1), there is no indication that the client-sender ever intended the memoranda that contains the redacted information to be confidential. Second, and similarly, the redaction itself pertains to information regarding the *Iowa League of Cities* case that is readily known to the public at large; thus, it is not itself "confidential information provided by the client," *Mead Data*, 566 F.2d at 254, and otherwise public information does not become confidential solely by virtue of its having been communicated to a lawyer as the basis for seeking legal advice. Put another way, it was no secret that EPA officials were evaluating the "implications" of *Iowa League of Cities* on the agency's programs, and in so doing, were discussing the facts of that case. (Vaughn Index at 5.) And far from revealing any confidential information, the redacted statement reflects nothing more than those discussions. Therefore, neither the deliberative-process privilege nor the attorney-client privilege applies to that redacted statement, and the EPA shall release the contents of that statement to H&A.[6]

### C. With One Exception, Neither The Working Law Doctrine Nor The Official Acknowledgment Doctrine Compels Disclosure Of The Privileged Information

Having established that the EPA properly invoked the deliberative-process

---

[6] If the Court were to consider the other documents for which the EPA has invoked the attorney-client privilege, i.e., Documents 2, 3, and 5 and the remainder of Document 1(b), the Court believes that the attorney-client privilege clearly applies to those documents and statements.

privilege with respect to the vast majority of the documents and statements at issue in this case, this Court must now consider whether or not the information the agency has withheld must nevertheless be disclosed, either because it is the "working law" of the agency (Pl.'s Mem. at 21), or because the EPA has already officially acknowledged the information contained in these records (*see id.* at 36). For the reasons that follow, this Court finds that neither doctrine applies, except as to one portion of Document 1(b), which the EPA has officially acknowledged.

1. None Of The Disputed Documents Constitute The Working Law Of The Agency

The D.C. Circuit has adopted and regularly applied the "working law" doctrine, which, in essence, maintains that there is "no legitimate policy interest of the government" in withholding any document that "in practice represent[s] interpretations of established policy on which the agency relies in discharging its regulatory responsibilities." *Coastal States*, 617 F.2d at 869. This means that an agency must disclose "statements of policy or final opinions that have the force of law, or which explain actions that an agency has already taken." *Taxation With Representation Fund*, 646 F.2d at 677.

Thus, the D.C. Circuit has required agencies to disclose memoranda that apply regulations to particular sets of facts that were before the agency. *See, e.g., Schlefer*, 702 F.2d at 244; *Coastal States*, 617 F.2d at 860; *Sterling Drug v. FTC*, 450 F. 2d 698, 708 (D.C. Cir. 1971). Likewise, an agency must disclose a statement or document that "address[es] the interpretation of [a set of] laws generally" and thereby "reflect[s] [the agency's] considered position on a precise issue[.]" *Tax Analysts v. IRS* ("*Tax Analysts II*"), 294 F.3d 71, 80 (D.C. Cir. 2002) (ordering the disclosure of a technical assistance

memorandum that explained whether taxpayers can utilize a particular procedure); *see also Pub. Citizen*, 598 F.3d at 875 (holding that an OMB description of "how it carries out its responsibilities fit[s] comfortably within the working law framework"); *Jordan v. DOJ*, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc) (requiring the D.C. United States Attorney's Office to disclose memoranda that set forth eligibility criteria for pre-trial diversion and charging decisions). In such situations, Exemption 5's attorney-client or deliberative-process privileges cannot be invoked to protect the documents at issue, even if those privileges otherwise appear to apply. *See Tax Analysts I*, 117 F.3d at 619 (attorney-client privilege); *Coastal States*, 617 F.2d at 866 (deliberative-process privilege).

Also noteworthy is the fact that, under D.C. Circuit precedent, the working law analysis and a court's evaluation of whether or not the deliberative-process privilege insulates a given document from disclosure in the first place are essentially interwoven inquiries. *See, e.g.*, *Pub. Citizen*, 598 F.3d at 874–76; *Coastal States*, 617 F.2d at 867–68. Indeed, "the appropriate [working law] analysis requires [the court] to determine whether the documents sought more closely resemble the type of internal deliberative and predecisional documents that Exemption 5 allows to be withheld, or the types of documents that section 552(a)(2) requires to be disclosed." *Brennan Ctr. for Justice*, 697 F.3d at 202; *see also Sears*, 421 U.S. at 153. In this way, working law and the deliberative-process privilege are almost "mirror image[s]" of one another, *Campaign for Accountability v. DOJ*, 278 F. Supp. 3d 303, 308 (D.D.C. 2017), and the only discernable way that the two assessments meaningfully differ with respect to the same document is that the working law doctrine can require consideration of whether a

particular document that once was predecisional and deliberative for the purpose of Exemption 5 (and thus protected from disclosure) has "los[t] that status" because the agency now uses the document "formally or informally, as the agency position on an issue[,]" *Coastal States*, 617 F.2d at 866; *see also Pub. Citizen*, 598 F.3d at 874 (acknowledging that "even if the documents [sought] were at one time predecisional and deliberative, OMB's informal adoption and application of the documents as its 'working law' render them final and thus subject to disclosure"). Put another way, ordinarily, if the deliberative-process privilege applies to a given document or statement, then that document or statement cannot be deemed the agency's working law, but a predecisional and deliberative document that is otherwise subject to protection under Exemption 5 may subsequently *become* the working law of the agency if the agency subsequently treats that document "formally or informally, as the agency position on an issue" or if that document "is used by the agency in its dealings with the public." *Coastal States*, 617 F.2d at 866; *see also Taxation With Representation Fund*, 646 F.2d at 681–82 (reaffirming and applying this principle).

This Court has already determined that nearly all of the disputed documents at issue in this case satisfy the requirements of the deliberative-process privilege, so they are not inherently the working law of the EPA. Therefore, at this point, the only remaining question is whether or not the EPA has transformed the documents at issue into the working law of the agency by using them to guide the agency's regulatory actions after its nonacquiescence decision on November 19, 2013. Based on the Court's *in camera* review of the disputed documents, the EPA's sworn affidavits, and the lack of any evidence contradicting those documents and affidavits, this Court concludes that

the EPA has carried its burden in demonstrating that it has not used these predecisional and deliberative documents in adjudicating cases that implicate the *Iowa League of Cities* decision (e.g., in the agency's water permitting decisions), *see Schlefer*, 702 F.2d at 244, nor does it treat these documents as an "interpretation of [a set of laws] generally" that "reflects the agency's considered position on a precise issue," *Tax Analysts II*, 294 F.3d at 80. Instead, and if anything, the EPA's working law with respect to the Eighth Circuit's opinion is reflected in the documents that the EPA has already publicly released. (*See, e.g.,* February 19, 2014 ILOC Strategy Document, Ex. 27 to Pl.'s Mem, ECF No. 44-4, at 91 (explaining the EPA's case-by-case approach for permitting decisions outside the Eighth Circuit); Desk Statement at 41 (functioning as a general statement of policy as to how the EPA intends to proceed in light of the *Iowa League* decision).) Furthermore, the Court's *in camera* review of the disputed documents reveals that these documents do not explain the agency's policy rationale for why it decided to pursue a nonacquiescence policy. *Cf. Sears*, 421 U.S. at 152–53 (noting that "the reasons which did supply the basis for an agency policy actually adopted" also constitute the working law of the agency).

H&A's arguments relating to the "working law" doctrine are not to the contrary. As it acknowledges, documents that are properly deemed predecisional and deliberative do not qualify as the working law of the agency, absent some indication that the agency has later adopted these documents in its adjudications or policy statements. (*See* Pl.'s Mem. at 19.) So, the question of whether the EPA is withholding documents that represent the agency's working law with respect to nonacquiescence necessarily turns on the "linchpin issue" of *when* the EPA made its nonacquiescence decision (*id.* at 24–

25), which is the same issue that this Court addressed in Part III.A.1 above. Of course, H&A disagrees with the Court's conclusions as to when the relevant nonacquiescence decision occurred, and thus it disagrees that the records in this case are predecisional as opposed to the working law of the agency. (*See* Pl.'s Mem. at 27.) But H&A does not contend that the Court's working law analysis is wrong on any independent ground, nor does it contend that the EPA so relies upon the information in these records when adjudicating permitting decisions that this otherwise deliberative and predecisional material has lost its privileged status.

   2. <u>The EPA Has Officially Acknowledged Some Of The Redacted Portions Of Document 1(b)</u>

  One other potential avenue for the divestment of privileged records is at issue in this case. As noted above, it is possible for an agency to *waive* its right to withhold a privileged document by officially and publicly acknowledging the information contained within that record. *See Cottone*, 193 F.3d at 554; *Higgins v. DOJ*, 919 F. Supp. 2d 131, 147 (D.D.C. 2013). Notably, however, the official acknowledgement doctrine only applies in the relatively unusual circumstance in which an agency has publically disclosed "the *specific* information sought by the plaintiff[,]" and the doctrine does not apply if the information sought is merely similar to the requested document or statement. *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 621 (D.C. Cir. 2011). So, for example, the D.C. Circuit has held that where (1) a FOIA plaintiff sought audiotapes of wiretap recordings that government prosecutors had played at a public trial and had moved into evidence, and (2) the plaintiff identified the name, date, and time for each of these tapes in his FOIA request, the defending agency could not withhold the requested tapes. *See Cottone*, 193 F.3d at 555. In other words, to

establish official acknowledgement, "the requesting plaintiff must pinpoint an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (citing *Wolf v. CIA*, 473 F.3d 370, 378–79 (D.C. Cir. 2007)).

Helpfully, the D.C. Circuit has spelled out the particular demands of the official acknowledgement doctrine. To successfully unearth protracted materials on this ground, the plaintiff must demonstrate that "(1) the information requested [is] as specific as the information previously released; (2) the information requested [] match[es] the information previously disclosed; and (3) the information requested [has] already [] been made public through an official and documented disclosure." *ACLU*, 628 F.3d at 620–21 (citations omitted); *see also Higgins*, 919 F. Supp. 2d at 147 (citation omitted). And once this is established, the doctrine applies both to entire documents and to the reasonably segregable parts of those documents, if the agency has officially acknowledged them. *See Shapiro v. DOJ*, 153 F. Supp. 3d 253, 286 (D.D.C. 2016).

Based on the evidence in the record and the Court's *in camera* review, this Court finds that the EPA has officially acknowledged one of the redacted portions of Document 1(b). Specifically, the redacted statements following the "From" and "To" headings on page one of that document exactly match information that the EPA previously released in response to another of H&A's FOIA requests. (*See* Partial EPA FOIA Response to Scope of ILOC Request, Ex. 6 to Pl.'s Mot., ECF No. 44-3, at 33.) The EPA's prior FOIA response constitutes an official and documented disclosure, because the information was previously "disclosed and preserved in a permanent public

record." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) (citation omitted); *see Valfells v. CIA*, 717 F. Supp. 2d 110, 118 (D.D.C. 2010) (explaining that "responses to FOIA requests are [] official to some degree" so long as the response comes from the same agency who is alleged to have officially acknowledged the document). And because it is the same information that was previously disclosed (word-for-word), the redacted information is every bit as specific as the prior disclosure.

By contrast, it is not clear to this court that the EPA has officially acknowledged any of the redacted contents of Document 4(b). (*See* Pl.'s Mem. at 36.) Although the EPA has previously discussed parts of that document "during a public workshop . . . and with Mr. Mike Tate" of the "Kansas Department of Health and Water," the agency avers that it has not publicly discussed the redacted information within this document (Vaughn Index at 12), and H&A has not provided any evidence that refutes this account. Indeed, H&A merely asserts that the EPA has previously spoken to Mike Tate about this document on a telephone call. (*See* Pl.'s Mem. at 36.) But even taken as true, those facts are not sufficient to carry H&A's burden of demonstrating that the information provided to Mike Tate or individuals attending the public workshop is as specific as, or matches, the information that the EPA has redacted from Document 4(b). *See Dongkuk Int'l, Inc. v. DOJ*, 204 F. Supp. 3d 18, 29 (D.D.C. 2016). Therefore, while the previously acknowledged material in Document 1(b) cannot be withheld, H&A's claim that the EPA has officially acknowledged the information within the redacted portions of Document 4(b) fails as a matter of law.

### D. H&A's Motion To Strike, Motion For Discovery, And Implied Motion For Sanctions Are Meritless

Finally, this Court's Order of March 31, 2018 addressed a hodgepodge of miscellaneous motions that H&A filed, including a motion for discovery, a motion to strike, and, within its motion for summary judgment, a request that the Court sanction the EPA and the DOJ. This Court enjoys broad discretion with respect to its rulings on each of these motions, and that discretion extends not only to whether the facts of a given case warrant any relief but also what remedy, if any, would be most appropriate. *See SafeCard Servs.*, 926 F.2d at 1200 (emphasizing the court's "broad discretion to manage the scope of discovery" in FOIA cases); *Canady v. Erbe Elektromedizin GmbH*, 307 F. Supp. 2d 2, 7 (D.D.C. 2004) ("The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion."); *Landmark Legal Found. v. EPA*, 82 F. Supp. 3d 211, 218 (D.D.C. 2015) (discussing how the power to sanction parties and agencies "must be exercised with restraint and discretion").

The Court has considered all three of these motions together—primarily because each of them appears to be motivated by H&A's apparent belief that the EPA has responded to H&A's FOIA request in bad faith and has repeatedly lied to this Court and other courts to shield its nonacquiescence policy from judicial review. (*See, e.g.,* Pl.'s Mem. at 38–40 (accusing the EPA of engaging in a "conspiracy to violate FOIA and eviscerate the judicial review process"); Pl.'s Reply at 19 (claiming that EPA's "bad faith [] has permeated EPA's nonacquiescence decision and handling of the FOIA request" (alterations omitted)).) There is no question that "the underlying activities that generated [a] FOIA request" may provide "[e]vidence of bad faith[.]" *Rugiero v. DOJ*, 257 F.3d 534, 544 (6th Cir. 2001); *see also Hall & Assocs. v. EPA*, 846 F. Supp. 2d

231, 246 (D.D.C. 2012).  But this Court's reading of the record and its *in camera* review of the documents in this case do not indicate that the EPA has acted in bad faith in this case or with respect to the proceedings that underlie it.  Instead, it appears that the EPA has simply failed to appreciate that the sentiment conveyed in the Desk Statement that the agency issued on November 19, 2013—i.e., that the EPA will continue to follow its existing interpretation of its regulations in jurisdictions outside the Eighth Circuit—counts as a nonacquiescence determination, and this misunderstanding on the agency's part more than amply explains why the EPA has consistently maintained that its records relating to this decision can be withheld under Exemption 5.  (*See, e.g.,* Suppl. Nagle Decl. ¶ 5 ("I further confirm that EPA has not, to date, decided whether and to what extent to follow *Iowa League* outside the Eighth Circuit[.]").)  Even more to the point, in this court's view, an earnestly held but mistaken view of the law, or a genuine miscalculation of the strength of one's legal arguments, rarely, if ever, evinces bad faith.  *See Moffat v. DOJ*, 716 F.3d 244, 255 (1st Cir. 2013) ("As an initial matter, we question whether an agency's incorrect invocation of FOIA exemptions can ever serve as evidence of bad faith."); *cf. Yah Kai World Wide Enterps., Inc. v. Napper*, 292 F. Supp. 3d 337, 374–75 (D.D.C. 2018), *appeal filed*, (emphasizing that a genuine, yet mistaken, belief is not bad faith).

The EPA's failure to identify certain documents as responsive to H&A's FOIA request initially (*see* Pl.'s Mem. at 21–23, 39 (discussing how a number of Plaintiffs' exhibits were released because of subsequent FOIA requests)), is also not inherently indicative of bad faith.  *See Pub. Emps. For Envtl. Responsibility v. U.S. Int'l Boundary and Water Comm'n*, 740 F.3d 195, 200 (D.C. Cir. 2014).  Indeed, as a result of various

FOIA requests, H&A received many of the records it originally sought, and the EPA's willingness to disclose these responsive non-exempt documents once it found them and identified them belies H&A's claim that the EPA has acted in bad faith. Thus, the agency's own record of general responsiveness supports its contention that it has made a good faith effort to satisfy its obligations under the FOIA. *See, e.g.*, *Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986) (rejecting appellant's contention of bad faith and noting that the agency had instead "cooperat[ed] with appellants by . . . responding to their inquiries, conducting numerous additional searches, and producing records when error was discovered").

H&A points to one final piece of evidence in the record in an effort to bolster its argument that the agency has acted in bad faith. One of the documents that H&A submitted as an exhibit states that the Department of Justice ("DOJ") once "caution[ed]" the EPA that "any formal expression of non-acquiescence runs the risk of a challenge." (Next Steps Memo at 42.) H&A seizes upon this statement as evidence that the EPA has sought to hide its nonacquiescence decision and to deceive the public and the courts about how it currently administers and enforces water permitting decisions. (*See* Pl.'s Mem. at 38–39.) However, any clear-eyed assessment of that particular statement reveals that it is also susceptible to a relatively benign meaning. Far from only making a nefarious suggestion that the EPA should act deliberately to conceal its position regarding *Iowa League of Cities*, it is certainly plausible that DOJ was merely advising the agency of the real-world consequences that might result from a formal nonacquiescence decision. In other words, the EPA might well have been weighing its options regarding whether or not to pursue nonacquiescence, and not

41

mulling various means to prevent the discovery of a secret nonacquiescence policy.

And even if this suggestion "reflects poorly upon [the] EPA" and DOJ, *Landmark Legal Found.*, 82 F. Supp. 3d at 213, this ambiguity is enough to keep the Court from reaching the conclusion that they EPA acted in bad faith.

In the absence of a clear showing of bad faith, the Court sees no reason to grant the miscellaneous motions that H&A has filed. Motions for discovery are "rarely allowed" in FOIA cases, *Canning v. DOJ*, 251 F. Supp. 3d 74, 76 (D.D.C. 2017), because "discovery requests in these cases threaten to 'turn FOIA on its head, awarding . . . plaintiff . . . the very remedy'" that it seeks through its lawsuit, *Freedom Watch v. BLM*, 220 F. Supp. 3d 65, 68 (D.D.C. 2016) (quoting *Tax Analysts v. IRS* ("*Tax Analysts III*"), 410 F.3d 715, 722 (D.C. Cir. 2005)); *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (explaining that requests for discovery generally "should be denied where an agency's declarations are reasonably detailed, submitted in good faith[,] and the court is satisfied that no factual dispute remains"). Similarly, this Court has found no grounds to strike the Nagle Declaration, especially given that "[c]ourts generally disfavor motions to strike[.]" *Canady*, 307 F. Supp. 2d at 7. Moreover, to the extent that H&A's motion for summary judgment requests sanctions against the EPA and/or agency counsel (*see* Pl.'s Mem. at 39), that request is inappropriate both because H&A has not filed a formal motion, and also because, as this Court has already explained, the record does not show "by clear and convincing evidence" that the EPA acted in "bad faith[,]" *Priority One Servs., Inc. v. W & T Travel Servs., LLC*, 987 F. Supp. 2d 1, 5 (D.D.C. 2013).

## IV.    CONCLUSION

For the reasons explained above, and as set forth in the March 31, 2018 Order, the Court has **GRANTED IN PART AND DENIED IN PART** the EPA and H&A's cross-motions for summary judgment as follows.  The EPA's motion for summary judgment is denied with respect to portions of Document 1(a),[7] portions of Document 1(b),[8] all of Document 4, and all of Document 6, and this information must be produced to H&A; meanwhile, the EPA's motion is granted with respect to the remaining disputed withholdings.  Likewise, H&A's motion for summary judgment is granted with respect to the ordered releases, and denied in all other respects.  The Court has also **DENIED** H&A's motion to amend the complaint to add an unreasonable search claim (*see* Part I.B, *supra*), and it has likewise **DENIED** H&A's motions to strike and for discovery, as well as any request for sanctions.

DATE:  May 22, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

---

[7] Specifically, on page one, the first three sub-bullets beneath the third bullet under the heading "Outside Of Eighth Circuit" and, on page two, the redacted statements under the heading "What we said in Region 7."

[8] The redacted statements in the "To" and "From" fields on the first page of the document, and on page one, the first complete paragraph immediately before the subheading "**1. Background.**"